SUPERIOR COAL CO., Appellant, *v.* MUSSELSHELL
COUNTY et al., Respondents.

(No. 7,282.)

(Submitted December 6, 1934. Decided January 4, 1935.)

[41 Pac. (2d) 14.]

502

*Mr. E. E. Fenton,* for Appellant, submitted a brief and argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, *Mr. Jeremiah J. Lynch,* First Assistant Attorney General, and *Mr. F. V. Watts,* County Attorney of Musselshell County, for Respondents, submitted a brief; *Mr. Lynch* argued the cause orally.

*Messrs. Gunn, Rasch, Hall & Gunn, Messrs. Cooper, Stephenson & Hoover, Messrs. Johnston, Coleman & Jameson, Messrs. Murphy & Whitlock, Messrs. Clift & Glover, Mr. D. M. Kelly, Mr. T. B. Wier, Mr. Louis P. Donovan* and *Mr. S. C. Ford, Amici Curiae,* submitted a brief; *Mr. M. S. Gunn* and *Mr. Ford* argued the cause orally.

510

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

From the foregoing statement it is seen that plaintiff's chief grievance is that it has been discriminated against in the taxation of its "interest and estate" in the lands described in its first cause of action for the reason that the lands have been taxed as mining claims at the price paid the United States therefor; while the Northern Pacific Railway Company, owning lands of the "same kind, character and class," has been taxed at the rate of fifty cents per acre solely upon the value of the right of the railway company to enter upon the surface of the lands for removing or exploring for and mining and removing the minerals therefrom. Upon this hypothesis it is argued that the plaintiff has not been given the equal protection of the laws, and if section 3 of Article XII of Montana's Constitution authorizes a discrimination of this sort, it offends the provisions of the Fourteenth Amendment and is void.

Section 3 of Article XII reads as follows: "All mines and mining claims, both placer and rock in place, containing or bearing gold, silver, copper, lead, coal or other valuable mineral deposits, after purchase thereof from the United States, shall be taxed at the price paid the United States therefor,

unless the surface ground, or some part thereof, of such mine or claim, is used for other than mining purposes, and has a separate and independent value for such other purposes, in which case said surface ground, or any part thereof, so used for other than mining purposes, shall be taxed at its value for such other purposes, as provided by law; and all machinery used in mining, and all property and surface improvements upon or appurtenant to mines and mining claims which have a value separate and independent of such mines or mining claims, and the annual net proceeds of all mines and mining claims shall be taxed as provided by law.''

We begin with the postulate that one who has purchased a mining claim from the United States is estopped from denying that it is a mining claim, and this is so whether the claim contains coal, or gold, silver, copper or lead. For the purpose of taxation, coal mining claims, lode mining claims and placer mining claims alike are governed by the provisions of the Constitution. This court also has determined that no matter what the source of title is, if a mine is developed upon a tract of land it is to be taxed as a mine (*Northern Pacific Ry. Co.* v. *Musselshell County,* 54 Mont. 96, 107, 169 Pac. 53, 56), but it has never intimated that a mine can be said to exist upon land patented by the government otherwise than as a mining claim, until the mine has actually been developed thereon and is, in fact, shown to be a mine. What we shall term for convenience plaintiff's lands, ''including both the surface and the subsurface,'' in the language of the trial court, were purchased as patented mining claims in tracts of various area, by different persons, from the United States of America, for the price of $20 per acre. Prior to the sale of the lands by the United States, the same, and all thereof, were examined by the United States Geological Survey and by it classified as coal lands.

Plaintiff is a successor in interest of the original purchasers thereof. It is not material that these claims have not been developed or that ''the extent and value of the coal, coal deposits, and other mineral deposits therein and thereunder is

wholly unknown," etc. This is true to a greater or less extent with respect to a gold-bearing mining claim, for which patent is obtained. A lode mining claim upon which only enough work has been done to enable its owner to obtain patent, may promise in its undeveloped state to become a bonanza, and yet the miner's hope of to-day may "be frustrated by the stroke of the pick tomorrow," as Mr. Clark, President of the Constitutional Convention, said in the course of debate when the convention was considering the taxation of mines. (And see *Northern Pacific Ry. Co.* v. *Musselshell County,* supra, page 106 of 54 Mont., 169 Pac. 53.)

It may be that every acre of the lands described in plaintiff's complaint is worth more than the price paid therefor in coal alone; some, or all, may be worthless. He who obtains a patent for coal or other mineral-bearing lands takes that risk. As to this we have no concern; for the purposes of taxation every acre is worth what was paid the United States therefor. With respect to the sale of coal lands by the United States, the supreme court has said: "It is not to be presumed that the small price per acre required from those desiring to obtain a title to such lands had any influence in determining the policy to be adopted in opening them to entry. They were held in trust for all the people; and, in making regulations for disposing of them, Congress took no thought of their pecuniary value, but, in the discharge of a high public duty, and in the interest of the whole country, sought to develop the material resources of the United States by opening its vacant coal lands to entry by individuals and by associations of persons at prices below their actual value." (*United States* v. *Trinidad Coal etc. Co.,* 137 U. S. 160, 170, 11 Sup. Ct. 57, 61, 34 L. Ed. 640.)

The law denies the assertion, repeatedly made by plaintiff, to which defendants seem to assent, that the United States granted to the Northern Pacific Railroad Company "coal land." When one speaks of the grant of "coal land" by the government to a purchaser one has in mind land which has been classified as such, and which has been sold pursuant to

the Act of Congress of March 3, 1873, 17 Stat. 607 (see 30 U. S. C. A., sec. 71 et seq.).

The railway company's lands were granted to the Northern Pacific Railroad (now Railway) Company by the Act of Congress of July 2, 1864, "An Act granting Lands to aid in the Construction of a Railroad and Telegraph Line from Lake Superior to Puget's Sound, on the Pacific Coast, by the Northern Route." (13 Stat. 365.) By section 3 of the Act (13 Stat. 367) the United States granted to the railroad company "every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line," etc. Provided, "that the word 'mineral,' when it occurs in this Act, shall not be held to include iron or coal."

Apparently the railway company has sold approximately 70,000 acres of these lands lying within Musselshell county, reserving the coal and iron therein, if any, and the right to enter upon the surface for mining the same. The assessor has taxed the railway company only upon that right of entry. The minerals *in situ* he has not assumed to tax.

The court found (evidently upon admissions in the pleadings) that the lands upon which the railway company has the right of entry are undeveloped coal lands from which no coal or other mineral of any kind has ever been mined, and that the extent and value of the coal and minerals therein and thereunder are unknown.

So plaintiff is confronted with this condition of affairs: The lands which it owns (less certain surface rights) have been officially determined to be mining claims; a fact which plaintiff is estopped to deny. The "railway" lands are not mining claims, and do not contain any mines. If mines eventually are developed in the railway lands they will be taxed as mines. (*Northern Pacific Ry. Co.* v. *Musselshell County*, supra; *Northern Pacific Ry. Co.* v. *Musselshell County*, 74 Mont. 81, 238 Pac. 872.) The tracts of land purchased by plaintiff's predecessors in interest are mining claims still. One who purchases a mining claim may not change its character and destroy its taxability as such by the simple device of selling

the surface with reservations and retaining the subsurface contents. That would indeed be a transparent subterfuge to escape the payment of taxes. (Compare *Murray* v. *Hinds,* 30 Mont. 466, 76 Pac. 1039; *Barnard Realty Co.* v. *City of Butte,* 50 Mont. 159, 145 Pac. 946, 947.) Yet, in the final analysis, plaintiff's first cause of action rests upon the theory that, the coal deposit *in situ* in its lands being free from taxation, and there being no annual net proceeds, as the surface ground is used for other than mining purposes and has a separate and independent value for such other purposes, that value must be taken as the basis for taxing mining claims. The argument in support of this theory centers about the word "unless" in section 3 of Article XII. It is said that "unless" means "if it be not that," or "except where," and if unless is given either of these meanings, the section commands the taxation of the surface at the price paid the government for the land; but if it is used for other than mining purposes, and has a separate and independent value for such other purposes, then that value shall be the basis of taxation. Let us analyze that portion of the section, emphasizing by italics essential words:

"All mines and mining claims, * * * after purchase thereof from the United States, shall be taxed at the price paid the United States therefor, unless *the surface ground, or some part thereof,* of such mine or claim, is used for other than mining purposes, and has a separate and independent value for such other purposes, in which case *said surface ground, or any part thereof,* so used for other than mining purposes, shall be taxed at *its* value for such other purposes, as provided by law."

That a more apt word than the conjunction "unless" could have been used to express the evident meaning of the quoted language, when it is analyzed as a whole, will be conceded. What is to be taxed *at the price paid the United States therefor?* First, the mine or mining claim, in its entirety, including the surface ground, and everything beneath, except as otherwise provided by law. When is the surface ground to be

taxed, and to what extent? When the surface ground, or some part thereof, of such mine or claim is used for other than mining purposes, and has a separate and independent value for such purposes.

This brings us to inquire as to the meaning of the word ██ ''surface'' in section 3 of Article XII, or perhaps we had better say ''surface ground.'' There is no agreed definition of a surface (Encyclopedia Britannica). Nor are the courts agreed upon a definition of the word ''surface.'' Surface or superficies, prima facie, means, of course, nothing more than the mere *vestimenta terrae*—''the top of the earth and whatever is upon the face thereof.'' (Stroud's Judicial Dictionary.) Generally speaking, its meaning must be determined from the context in which it is used.

The supreme court of West Virginia says that when used in a deed without any qualifying phrase, the word ''surface'' signifies only the superficial part of the land. (*Drummond* v. *White Oak Fuel Co.*, 104 W. Va. 368, 140 S. E. 57, 58, 56 A. L. R. 303; *Jeffrey* v. *Spruce-Boone Land Co.*, 112 W. Va. 360, 164 S. E. 292, 86 A. L. R. 966.) ''In using the word 'surface,' the layman in casual conversation, as well as the judge in a considered opinion, ordinarily refers merely to the superficial part of land.'' (*Drummond* v. *White Oak Fuel Co.*, supra.)

The context considered thus is the meaning of the words ''the surface ground'' in section 3 of Article XII. This definition does not contemplate that the use of the surface ground, for purposes other than mining, shall be more extensive than proper surface uses require, as, by way of illustration, for grazing, agricultural, residential or town-site purposes.

Now as to the taxability of the surface ground. The grantee of the United States when he receives letters patent for his mine or mining claim owns the same from and including the surface to the center of the earth, save for such reservations as may be made in the patent, or as may be provided by law. (*Hinz* v. *Musselshell County*, 82 Mont. 502,

267 Pac. 1113, 1116; *Musselshell County* v. *Morris Development Co.,* 92 Mont. 201, 11 Pac. (2d) 774, 776.) Speaking for the court in *Barnard Realty Co.* v. *City of Butte,* supra, wherein the question of taxing the surface of a mining claim, under the provisions of section 3, Article XII, was involved, Mr. Chief Justice Brantly had this to say respecting the taxation of surface ground: "But when the property, having by its location acquired a value for some independent use, is devoted by the owner to such use, it becomes at once subject to taxation at that value as is other real estate, to be ascertained by the assessing officer just as he ascertains the value of other land for the purpose of taxation. By devoting it to the new use, the owner, so to speak, creates an estate which, in the eye of the law, is regarded as independent of the original estate and is subject to taxation as such."

In *Hinz* v. *Musselshell County,* supra, after quoting from *Barnard Realty Co.* v. *City of Butte,* supra, we said: "The design, then, was, first, to tax the mining claim reckoned upon its acreage; in addition, to tax the surface if it came to pass that the surface, when used for purposes other than mining, had a separate and independent value for such purposes; in addition, to tax the machinery used in mining, and all property and surface improvements upon or appurtenant to mines and mining claims which have a value separate and independent of such mines and mining claims; and, finally, to tax the annual net proceeds 'of all mines and mining claims.' Certainly it cannot be contended that the separate and independent value which the surface, not used for mining purposes but being used for other purposes and having a value for such other purposes, shall constitute the assessable value of the mining claim rather than the value fixed by the Constitution. A process of that nature would fritter away by construction the plain language and purpose of section 3, Article XII. A familiar condition will serve for illustration: A mining company has a group of adjoining lode mining claims, let us say ten, to which it has received patent from the United States. Supposing the claims are of the full size allowed by

law, the group embraces over 216 acres. The price paid the United States was $5 per acre. The company has ceased mining. The claims, lying on the grassy slopes of the mountain furnish pasture for sheep, and the company rents them for that purpose at ten cents per acre per annum. Thus the surface ground of the mining claims has a separate and independent value for pasturing sheep, and is used for that purpose. But can it be possible that the value of the claims as a sheep pasture and not the price paid the government is to be reckoned as the assessable value of the mining claims? It cannot be.''

Plaintiff's predecessor in interest could not purchase at $20 an acre a tract of coal land from the United States, and then, by selling the entire tract except the surface ground worth $3 an acre for agricultural purposes, bring the whole claim within an assessment of only $3 an acre.

In *Musselshell County* v. *Morris Development Co.,* supra, we said: ''It is asserted by defendants that by the use of the phrase 'reckoned upon its acreage,' as used in the foregoing excerpt, as well as by the language appearing in prior decisions, the court added to the wording of the Constitution something that is not therein written. It is true that these words are not in the constitutional section under consideration. The constitutional mandate is that 'all mines and mining claims * * * shall be taxed at the price paid the United States therefor.' The price paid to the United States for the claim here involved was based upon a stated sum per acre, and to tax it in the same manner is a direct compliance with the Constitution. This method of taxation does not signify that the tax on the mining claim, as such, is on the surface only. The mine or mining claim that should be taxed at the price paid the government consists not only of the surface rights for mining purposes, but embraces the subsurface contents as well. Such a tax does not operate as a tax upon the minerals in place as such. The subsurface contents, inclusive of the minerals in place, constitute a part of the mine or mining claim as much so as the surface rights used for mining pur-

poses. The two together constitute the property that must be taxed at the price paid the government. The land here involved was purchased from the United States as a part of a mine or mining claim. The taxable value of the mine or claim is fixed by the Constitution at the price paid the United States therefor; and 'that value is fixed and immutable,' and the command of the Constitution is clear and imperative. (*Hinz* v. *Musselshell County,* supra; *State ex rel. Hinz* v. *Moody,* 71 Mont. 473, 230 Pac. 575.)''

We reaffirm the foregoing language from the *Hinz* and *Morris Development Co. Cases.* It follows, then, that in the first instance the Constitution places upon a mine or mining claim for taxation purposes as an arbitrary value that which the patentee paid to the government per acre; the surface ground by itself is not taxed at any value; it is part of the mine; it is presumed that it has no value except for use in working the mine. When the surface ground of a mining claim, or some part thereof, is used for some purpose other than mining, and the owner of the mining claim sells that surface, or some part thereof, reserving sufficient thereof to enable him to conduct his mining operations, to all intents and purposes he is still the owner of the mining claim; all he has sold is the newly created estate ''which, in the eye of the law, is regarded as independent of the original estate.'' This is the purport of the conclusions we reached in the *Hinz Case* (with an exception presently to be noted) and in the *Morris Development Co. Case,* and after a careful consideration of all Montana decisions upon the subject, we are satisfied that it reflects the true meaning of section 3 of Article XII, with respect to the taxation of surface ground which is used ''for purposes other than mining and which has a separate and independent value for such purposes.''

Some confusion has arisen from the use of the generic terms ''corporeal hereditament'' and ''incorporeal hereditament'' in prior cases, notably in *Northern Pacific Ry. Co.* v. *Musselshell County,* 54 Mont. 96, 169 Pac. 53, and in the *Hinz Case.* The right of the Northern Pacific Railway Company to enter

upon lands which it has sold for the purpose of exploring for and extracting the coal beneath the surface, if any be found, is an incorporeal hereditament, as was the right of Hinz to purchase surface ground which his predecessor had sold in order to exploit his mining claim, but it was unnecessary in the *Hinz Case* to refer to the mining claim as a corporeal hereditament, or to attempt to distinguish between the two estates. Hinz was the owner of the mining claim and the only result following the ownership of his right to purchase surface land was to lessen the taxable value of the estate in surface ground which his predecessor's grantee had purchased. So here, the use of the surface ground by the plaintiff, or the right to the use thereof, has a tendency to lessen the value of the estate in the surface ground of plaintiff's mining claims which others may own. To the extent that the value of the separate and independent estate is lessened by plaintiff's superior rights therein, to that extent the value of the separate estate is lessened in value, which should be taken into consideration by the assessor in assessing the surface rights of others. But this does not affect the duty of plaintiff to pay taxes upon its mining claims at the price paid the United States therefor. (*Musselshell County* v. *Morris Development Co.,* supra.) If there be anything in the *Hinz Case* which may be deemed contrary to what we now hold, to that extent the opinion is disapproved.

Montana has a clear and undoubted right to place mines and mining claims of every kind in the same class for purposes of taxation, and especially is this so when its Constitution so commands. As has been shown, the source of title to mines is not the controlling factor. It is true that there may be some inequality in the taxation of the surface ground in case a valuable mine be developed upon a farm acquired as a homestead under the laws of the United States, theretofore taxed at its value as a farm, or upon lands granted to the Northern Pacific Railway Company, which, before the discovery of the mine, yielded large crops of grain and hay. But this is of no material consequence; otherwise the mine

will be taxed as other mines are taxed. (*Northern Pacific Ry. Co.* v. *Mjelde*, 48 Mont. 287, 137 Pac. 386; *Northern Pacific Ry. Co.* v. *Musselshell County*, 54 Mont. 96, 107, 169 Pac. 53, 56; *Musselshell County* v. *Morris Development Co.*, supra.)

What was said in *State ex rel. Hinz* v. *Moody*, 71 Mont. 473, 230 Pac. 575, 577, adequately answers points raised in behalf of plaintiff. In that case, as in this, the property of the relator consisted of coal lands classified and approved as such by the department of the United States government, which had been purchased by the relator at the price of $20 per acre. The court, speaking through Judge Leiper, observed: "The Constitution of Montana was adopted by our constitutional convention and ratified by the people of Montana in 1889. The Act of Congress of March 3, 1873, supra, was therefore in force at the time of the adoption and ratification of our Constitution; and we think it may fairly be assumed that the framers of our Constitution had in mind this act of Congress when the provisions of section 3 of Article XII of the Constitution were under consideration." The property involved, the court went on to say, consisted of mining claims, and an arbitrary rule having been fixed for taxing the same, the query was presented, Is the tax to be upon that value, or upon some part of it? which the court answered by saying: "The language used is that this property '*shall be taxed at the price paid the United States therefor.*'" Continuing, the learned judge said: "Counsel for relator insists that to tax the property in question at the price paid the United States therefor is violative of the provisions of the Constitution, providing for the uniform assessment and taxation of property. The requirement of uniformity is a limitation upon the powers of the legislature. Section 1 of Article XII of the Constitution, as above noted, imposes upon the legislature the duty to 'prescribe such regulations as shall secure a just valuation for taxation of all property, except that specially provided for in this Article.' Section 16 of the same Article provides: 'All property shall be assessed in the manner prescribed by law except as is otherwise provided in this Constitution.' But, where the Constitution itself

fixes the value at which property shall be taxed, the uniformity rule does not apply. (*Hilger* v. *Moore* [56 Mont. 146, 182 Pac. 477], supra; *Northern Pac. Ry. Co.* v. *Musselshell County* [54 Mont. 96, 169 Pac. 53], supra.) It is urged that, if this property is taxed at the full price paid the United States therefor, some inequalities will result. With this contention we cannot agree; but, even if such be the fact, the responsibility must rest with the framers of our Constitution and with those who ratified it. (*Northern Pacific Ry. Co.* v. *Musselshell County,* supra; 12 C. J. 702, 703; Cooley on Constitutional Limitations, supra.) The language used, 'shall be taxed at the price paid the United States therefor,' is plain, clear, unambiguous. For this court to say that the property in question shall be taxed upon a valuation other than the price paid to the government therefor is to read into our Constitution a provision which is not there.''

Notwithstanding that the plaintiff has attempted to differentiate, to some extent at least, between the character of the interests which it owns in the properties described in its complaint, the fact remains that from what has been said heretofore the properties it owns all consist of mining claims of which it has the ownership with the right to enter upon the surface for mining the same. As it is and has been the purpose of the state of Montana under its Constitution to place mines and mining claims in one classification, and the county authorities of Musselshell county have pursued that course with substantial accuracy as appears from the record, the claim that there has been an unfriendly discrimination against the plaintiff cannot be sustained.

It has been remarked frequently that no perfect system of taxation has been devised, and it is to be expected that occasionally inequalities will result. But this is not the unfriendly discrimination which is fatal to the tax. Clearly, there is not any unfriendly discrimination in favor of the railway company and against the plaintiff; the railway company possesses the right of entry upon lands which are

neither mining claims nor mines—there being no showing that any mining claim has ever been developed on any of them— and the lands of the plaintiff which are mining claims. It is not shown in this record that the operation of the provisions of section 3, Article XII, impinges upon the provisions of the Fourteenth Amendment in any degree.

We think, as it was said in the leading case of *Bell's Gap Ry. Co.* v. *Commonwealth of Pennsylvania,* 134 U. S. 232, 10 Sup. Ct. 533, 535, 33 L. Ed. 892, that the law does not make any discrimination in this regard which the state is not competent to make. In that case the court said: "The provision in the fourteenth amendment, that no state shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a state from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property from any taxation at all, such as churches, libraries, and the property of charitable institutions. It may impose different specific taxes upon different trades and professions, and may vary the rates of excise upon various products; it may tax real estate and personal property in a different manner; it may tax visible property only, and not tax securities for payment of money; it may allow deductions for indebtedness, or not allow them. All such regulations, and those of like character, so long as they proceed within reasonable limits and general usage, are within the discretion of the state legislature, or the people of the state in framing their Constitution. But clear and hostile discriminations against particular persons and classes, especially such as are of an unusual character, unknown to the practice of our governments, might be obnoxious to the constitutional prohibition. It would, however, be impracticable and unwise to attempt to lay down any general rule or definition on the subject that would include all cases. They must be decided as they arise. We think that we are safe in saying that the fourteenth amendment was not intended to compel the states to adopt an iron rule of equal taxation. If that were its proper

construction, it would not only supersede all those constitutional provisions and laws of some of the states, whose object is to secure equality of taxation, and which are usually accompanied with qualifications deemed material, but it would render nugatory those discriminations which the best interests of society require; which are necessary for the encouragement of needed and useful industries, and the discouragement of intemperance and vice, and which every state, in one form or another, deems it expedient to adopt." (*Merchants' & Manufacturers' Nat. Bank* v. *Pennsylvania*, 167 U. S. 461, 17 Sup. Ct. 829, 42 L. Ed. 236; *Magoun* v. *Illinois Trust & Sav. Bank*, 170 U. S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1037; *American Sugar Refining Co.* v. *Louisiana*, 179 U. S. 89, 21 Sup. Ct. 43, 45 L. Ed. 102; *King* v. *Mullins*, 171 U. S. 404, 18 Sup. Ct. 925, 43 L. Ed. 214; *Travelers' Ins. Co.* v. *Connecticut*, 185 U. S. 364, 22 Sup. Ct. 673, 48 L. Ed. 949; *Michigan C. R. Co.* v. *Powers*, 201 U. S. 245, 26 Sup. Ct. 459, 50 L. Ed. 744; *Citizens' Telephone Co.* v. *Fuller*, 229 U. S. 322, 32 Sup. Ct. 833, 57 L. Ed. 1206; *Farmers' & M. Sav. Bank* v. *Minnesota*, 232 U. S. 516, 34 Sup. Ct. 354, 58 L. Ed. 706; *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245, 43 Sup. Ct. 83, 67 L. Ed. 237; *Stebbins* v. *Riley*, 268 U. S. 137, 45 Sup. Ct. 424, 69 L. Ed. 884, 44 A. L. R. 1454; *Ohio Oil Co.* v. *Conway*, 281 U. S. 146, 50 Sup. Ct. 310, 74 L. Ed. 775; *State Board of Tax Commissioners of Indiana* v. *Jackson*, 283 U. S. 527, 51 Sup. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464; *Woco Pep Co. of Montgomery* v. *Butler*, 225 Ala. 256, 142 So. 509.)

It has been declared by the supreme court of the United States that the fourteenth amendment was not "intended to compel the state to adopt an iron rule of equality" (*Giozza* v. *Tiernan*, 148 U. S. 657, 13 Sup. Ct. 721, 37 L. Ed. 599), and, also, that that amendment was not intended "to subvert the systems of the states pertaining to general and specific taxation." (*Cass Farm Co.* v. *Detroit*, 181 U. S. 396, 21 Sup. Ct. 644, 45 L. Ed. 914 [916]; *Kellaher* v. *City of Portland*, 57 Or. 575, 112 Pac. 1076; *State* v. *Lawrence*, 108 Miss. 291, 66 So. 745, Ann. Cas. 1917E, 322; see, also, *Merchants' Nat. Bank* v.

*Dawson County,* 93 Mont. 310, 19 Pac. (2d) 892; *O'Connell* v. *State Board of Equalization,* 95 Mont. 91, 25 Pac. (2d) 114; *Lake Superior Mines* v. *Lord,* 271 U. S. 577, 46 Sup. Ct. 627, 70 L. Ed. 1093; Brannon on the Fourteenth Amendment, 323.)

We conclude that the plaintiff has no just cause for complaint upon its alleged first cause of action.

2. Nor do we think the plaintiff has sustained its alleged second cause of action. It appears that the assessor sent out the customary blanks to the plaintiff in which the lands were valued as mining claims, which was proper, with the request that the plaintiff return the blanks properly sworn to within ten days. This the plaintiff did not do, waiting until the 12th of April, when it returned the statements, claiming its right to be assessed upon its right of entry upon the lands taxed at fifty cents per acre.

Regardless of whether the assessor did or did not make an arbitrary assessment upon the lands because of the failure of plaintiff to return the blanks within time, under the provisions of section 2007, Revised Codes 1921, in the circumstances no good purpose would have been served if the assessor had followed the provisions of section 2270, Id. (as amended by Laws 1925, Chap. 142, sec. 1), which provides that, when the assessor has increased the value which the taxpayer has placed upon property in the return made by him, the assessor shall give the owner notice of the increase, thus affording the taxpayer an opportunity to appear before the board of equalization. The assessor retained without change the amount which he placed in the assessment blanks when he forwarded the same to the plaintiff; he maintained his position that it was his duty to assess plaintiff's lands as mining claims. No change in the amount could have resulted from a hearing if one had been had. We agree with the trial court that, as the assessor is compelled to assess the plaintiff's properties at the price paid the United States therefor, if it be assumed that an increase or change was made by the assessor without notice to the plaintiff, such action did not affect plaintiff's rights. The law does

not require idle acts, and disregards trifles. (Secs. 8761, 8762, Rev. Codes 1921.)

3. The pleas of *res adjudicata* set forth in the third and fourth causes of action were of no avail. In the action in which the Bair-Collins Company, a predecessor in interest of plaintiff, was the plaintiff, and Musselshell county and its county officers were defendants, it was adjudged that the defendants be perpetually enjoined and restrained from assessing the minerals, coal, iron, gas and oil in and under the lands described. In the judgment obtained by plaintiff's predecessor Hinz against Musselshell county and its treasurer, a somewhat similar judgment was entered. Those judgments have no application here. They were rendered upon conditions obtaining at the time, which were not present when this action was begun.

"The estoppel of a judgment extends only to the facts and conditions as they were at the time the judgment was rendered, and to the legal rights and relations of the parties as fixed by the facts so determined; and when new facts or conditions intervene, before the second suit, furnishing a new basis for the claims and defenses of the parties respectively, the issues are no longer the same, and hence the former judgment cannot be pleaded in bar in the subsequent action." (34 C. J. 808; *In re Pomeroy,* 51 Mont. 119, 151 Pac. 333.)

In the *Hinz Case* the court went no further than to restrain the sale of the property and the issuance of a deed thereto, and to declare that the taxes for certain years were illegal and void. It did not restrain the levying of taxes against the property as to any year following 1927.

Moreover, in this action the method adopted by the assessor was not an assessment of the coal or other minerals in place beneath the land, but the assessment upon plaintiff's lands as mining claims at the price paid the United States therefor.

The judgment is affirmed.

Associate Justices Angstman, Matthews, Stewart and Anderson concur.

Rehearing denied January 18, 1935.