BRITISH–AMERICAN OIL PRODUCING CO., PLAINTIFF, *v.* STATE BOARD OF EQUALIZATION ET AL., DEFENDANTS.

(No. 7,505.)

(Submitted December 10, 1935. Decided January 22, 1936.)

[54 Pac. (2d) 129.]

*Mr. G. S. Frary* and *Mr. E. K. Cheadle, Jr.,* for Plaintiff, submitted an original and a reply brief; *Mr. Frary* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Jeremiah J. Lynch,* First Assistant Attorney General, for Defendants, submitted a brief; *Mr. Lynch* argued the cause orally.

*Messrs. Hall & McCabe,* for Intervener Blackfeet Tribe of Indians.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiff, the owner of a producing oil and gas lease on certain lands within the Blackfeet Indian Reservation, brought this original proceeding to secure an injunction against the State Board of Equalization and the individual members of the board in their official capacity, to enjoin them from collecting the "corporation license tax," the "operators' net proceeds tax," the "gross production tax," and the "royalty owners' net proceeds tax" arising out of the production and recovery of oil from the leased lands and premises.

In its complaint plaintiff alleges its corporate capacity and the official capacity of the defendant board. It is then alleged that prior to July 10, 1934, the Blackfeet Tribe of Indians, of the reservation bearing the same name in Glacier county, was the owner of all the oil and gas and other minerals in and under certain described lands, and that on the latter date, acting in accordance with a resolution of the Blackfeet Tribal Council dated June 10, 1934, and in accordance with the provisions of the laws of the United States and the regulations of the Department of the Interior, and for a good consideration, the superintendent of this Indian reservation as lessor made and delivered

to Consolidated Gas Company, a corporation, as lessee, a certain oil and gas lease describing these lands, for a term of five years from the date of the approval of the lease and as long thereafter as oil or gas was found in paying quantities. Thereafter, on October 5, 1934, this oil and gas lease was duly approved by the First Assistant Secretary of the Interior as required by law and the regulations of the Department of the Interior. It is then alleged that thereafter, and for a good and valuable consideration, the lessee sold, assigned and transferred to the plaintiff the lease and all right, title and interest therein, which assignment was on August 5, 1935, duly approved by the Assistant Secretary of the Interior as required by the laws of the United States and the regulations of the Department of the Interior, and that pursuant to the terms and provisions of the lease plaintiff entered upon the lands, and during the years 1934 and 1935 drilled to completion ten oil and gas wells, all of which were productive of oil or gas in paying quantities. It is further alleged that the plaintiff in the development and operation of these oil and gas wells is acting as an instrumentality and agent of the United States of America, and as such is not taxable by the state of Montana, and that the state of Montana and its officers are wholly without power to tax the plaintiff in the particulars mentioned supra.

The plaintiff alleges the nature of and the statutory authority for each of the taxes, and that the defendants are attempting and threatening to assess, levy and collect these taxes on the crude oil produced on these lands. The complaint contains other allegations necessary to invoke the original jurisdiction of this court.

The Blackfeet Tribe has by leave of this court filed a complaint in intervention, which alleges that its members are duly enrolled in accordance with the laws of the United States; that they reside within the Blackfeet Indian Reservation pursuant to and under the provisions of treaties between the tribe and the United States of America; that the complainant is a body politic duly constituted by the laws of the United States, and is gov-

erned by the tribal council under the supervision of the Secretary of the Interior, and that all of the lands embraced within the confines of the reservation, except those upon which patents in fee have been issued, are held and owned by the United States of America in trust for the benefit of the tribe. It is then alleged that on October 17, 1855, a treaty was entered into between the United States and the members of this tribe whereunder the tribe or nation was given exclusive jurisdiction over certain territory; that thereafter, in consideration of payments of money, the area of this reservation was reduced pursuant to an agreement, and in consideration of the relinquishment of a large tract of land by the tribe it was "understood by said tribe and the members thereof that the lands embraced within said reservation should be forever free from taxes levied by any local or state authority," which agreement was in effect at the time of the admission of the state of Montana into the Union and the adoption of its Constitution; that subsequent to the year 1896 it was agreed that the lands embraced within the reservation should be allotted in severalty under the existing laws, the title to the lands so allotted to be held for a period of twenty-five years in trust for the benefit of the individual allottees, and that as long as the lands were so held in trust no taxes should be levied by local or state authorities; that upon lands embraced within the reservation and held in trust for the benefit of the tribe oil and gas leases have been given under the authority of the United States with the consent of the tribe, upon and under which leases, wells have been drilled which produce oil and gas in commercial quantities, and that the oil and gas leases provide for the payment of a royalty of 12½ per cent., payable in money to the United States for the benefit of the tribe. It is then alleged that the oil so produced from tax-exempt lands, and the royalty derived from the production of the oil are being attempted to be subjected to the oil royalty tax pursuant to certain statutory provisions of the state of Montana, which will be hereafter noted, and that unless the taxing authorities are restrained and enjoined they will proceed

to levy, collect, and impose these taxes. It is further alleged that "by reason of the treaties, agreements and statutes of the United States, and the Enabling Act, the Constitution and the statutes of the State of Montana, said lands, the oil and gas produced therefrom and the royalties derived therefrom are exempt from taxation, and that said tribe and the individual members thereof have a vested property right in such tax exemption, and that to permit the levy of such tax upon said oil and gas so produced and upon said royalties, would deprive said tribe and said members of property without due process of law, in violation of the provisions of the Constitution of the United States and would impair the obligations of contracts, treaties and agreements between said tribe and said individual members and the United States, and between the State of Montana and the United States in violation of the provisions of the Constitution of the United States and the State of Montana."

The defendants have interposed demurrers to both complaints challenging their sufficiency for substance. It was stipulated between the plaintiff and defendants that the complaint should be amended to show that all of the lands described in the oil and gas leases mentioned in the complaint were lands on which trust patents had been issued to individual Indian allottees, but all of which trust patents contained the following reservation: "Also reserving, to the United States, in accordance with the provisions of the Act of June 30, 1919 (41 Stat. 17), all minerals, including coal, oil and gas, for the benefit of the Blackfeet Tribe of Indians until Congress shall otherwise direct."

In the brief filed by the state subsequent to oral argument on these demurrers it is asserted that this court is without jurisdiction to entertain the complaint in intervention of the Blackfeet Tribe and it without capacity to sue. This argument presents a serious question. (*United States* v. *Candelaria*, 271 U. S. 432, 46 Sup. Ct. 561, 70 L. Ed. 1023.) However, in view of the conclusion which we have reached, the net result being the same as if we had sustained this contention, we shall express

no opinion on it, but treat the complaint in intervention as though it was one over which we had jurisdiction without doubt.

The corporation license tax law provides (secs. 2296 to 2304, inclusive, as amended by Chapter 166, Laws 1933) for a tax "of two (2) per centum upon the total net income received by such corporation in the preceding fiscal year from all sources within the State of Montana." (Rev. Codes 1921, sec. 2296, as amended by Laws 1933, Chap. 166, sec. 1.) Certain corporations are without the provisions of the Act, none of which are here involved. The Act contains numerous provisions with reference to the manner of computing the tax, and provides for deductions, etc., not here important. Section 2398, as amended by Chapter 67, section 1 of the Laws of 1923, provides in part as follows: "Every person engaging in or carrying on the business of producing, within this state, petroleum, or other mineral or crude oil, or engaging in or carrying on the business of owning, controlling, managing, leasing or operating within this state any well or wells from which any merchantable or marketable petroleum or other mineral or crude oil is extracted or produced, sufficient in quantity to justify the marketing of the same, must, for the year 1923, and each year thereafter, when engaged in or carrying on any such business in this state, pay to the state treasurer, for the exclusive use and benefit of the State of Montana, a license tax for engaging in or carrying on such business in an amount equal to two per centum of the total gross value of all petroleum and other mineral or crude oil produced by such person within this state during such year." We will refer to this hereafter in the opinion as the gross production tax.

Section 2089, Revised Codes 1921, as amended by Chapter 188, section 1 of the Laws of 1935, provides: "Every person, partnership, corporation or association, engaged in mining * * * from or upon any mine whatsoever containing * * * petroleum, natural gas or other valuable mineral or mineral deposits must on or before the thirty-first day of March in each year make out a statement of the gross yield of the

above named metals or minerals from each mine owned or worked by such * * * corporation.'' The statement is to be made by the proper officer to the defendant board and is to contain the various matters enumerated in the section.

By the terms of section 2090, as amended by section 2 of Chapter 188 of the Laws of 1935, it is made the duty of the defendant board to compute the gross value of the product in dollars and cents so reported and to calculate and compute the net proceeds by making certain deductions from the gross product as provided in the section.

Under the terms of section 1 of Chapter 188 of the Laws of 1935, the operator is required to furnish the defendant board with the names and addresses of any and all persons owning or claiming any royalty interest in the product of the mine and the proceeds derived from its sale, and the amounts paid or yielded as royalty to each of such persons during the period covered by the statement. By section 3 of the chapter the board is directed, on receipt of the schedule setting forth the names and addresses of persons owning or claiming royalty, to assess the same at the full cash value of the money or product yielded during the preceding year, to be taxed on the same basis as the net proceeds of mines as provided by section 1999, Revised Codes of 1921. By section 5 of the chapter, amending Rev. Codes 1921, section 2091, the board is directed to transmit at a specified time the valuation of the net proceeds of mines and mining claims for the purposes of taxation, to the county clerks of the respective counties, to be placed on the assessment roll of net proceeds of mines. By section 6 of the same Act the defendant board is directed to transmit the royalty lists to the county clerks of the respective counties who must prepare a tax roll in the personal property assessment book in the name of the operator of the mine, ''and such assessments when entered shall have all the force and effect as if made in the names of the owners of such royalty individually as well as against the operator. The county treasurer shall proceed to give full notice thereof to such operator and to collect the same in manner pro-

vided by law. The operator or producer shall be liable for the payment of said taxes, and same shall be payable by, and shall be collected from, such operators in the same manner and under the same penalties as provided for the collection of taxes upon net proceeds of mines; provided, however, that after payment of such tax such operator may recover or withhold from any proceeds of royalty interest, either in kind or in money, coming into his hands, the amount of any tax paid by him upon such royalty or royalty interest.''

The first contention of the defendants is that the Blackfeet Indian Reservation is an Executive order reservation, and that Congress by the Act of March 3, 1927 (44 Stat. 1347, secs. 1–3, 25 U. S. C. A., secs. 398a, 398b and 398c), has given its consent to the imposition of these taxes. The same contention was made by the same defendants in the case of *Santa Rita Oil & Gas Co.* v. *State Board of Equalization,* ante, p. 268, 54 Pac. (2d) 117. We there held that this contention on behalf of the state was without merit, and for the reasons there recorded and upon the authorities there cited, we again decide the contention adversely to the defendants.

Plaintiff bases its entire argument on the premise that these lands included within the leases in question are all allotted Indian reservation lands, and argues on the authority of *United States* v. *Rickert,* 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532, *Indian Territory Illuminating Oil Co.* v. *Oklahoma,* 240 U. S. 522, 36 Sup. Ct. 453, 60 L. Ed. 779, *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292, 35 Sup. Ct. 27, 59 L. Ed. 234, *Gillespie* v. *Oklahoma,* 257 U. S. 501, 42 Sup. Ct. 171, 66 L. Ed. 338, *Jaybird Min. Co.* v. *Weir,* 271 U. S. 609, 46 Sup. Ct. 592, 70 L. Ed. 1112, that the state of Montana is without authority to levy and impose these taxes. Certain other cases are cited by it which apply peculiarly to the royalty tax which we shall hereafter during the course of the opinion notice more in detail. We have given consideration to these decisions by the Supreme Court of the United States in the opinion in the *Santa Rita Oil & Gas Company Case,* supra, and if the premise on which plain-

tiff founds its argument were sound, we should, on the authority of that decision, hold that the imposing, levying and collecting of the gross production tax and the operators' net proceeds tax should be enjoined.

As to the corporation license tax, however, we now hold, for the reasons stated in the opinion just referred to, the facts applicable to that tax here being identical, that the contention is without merit.

It therefore becomes necessary for us to examine into and determine whether the premise on which plaintiff founds its argument is sound. True, trust patents have been issued to individual allottees covering all of the lands described in the lease, but in each of these patents the provision is found reserving the oil and gas for the benefit of the Blackfeet Tribe of Indians until Congress shall direct otherwise. It is noteworthy, in passing, that the lease, a copy of which is attached to the exhibit, after reciting the dates and the names of the parties, declares that it is executed under and in pursuance of section 3 of the Act approved February 28, 1891, 26 Stat. 795 (25 U. S. C. A., sec. 397), as amended by the Act approved May 29, 1924, 43 Stat. 244 (Public No. 458, 68th Congress). The amendment there referred to is section 398 of title 25 U. S. C. A., providing as follows: ''Unallotted land on Indian reservations other than lands of the Five Civilized Tribes and the Osage Reservation subject to lease for mining purposes for a period of ten years under the preceding section may be leased at public auction by the Secretary of the Interior, with the consent of the council speaking for such Indians, for oil and gas mining purposes for a period of not to exceed ten years, and as much longer as oil or gas shall be found in paying quantities, and the terms of any existing oil and gas mining lease, may in like manner be amended by extending the term thereof for as long as oil or gas shall be found in paying quantities: Provided, That the production of oil and gas and other minerals on such lands may be taxed by the State in which said lands are located in all respects the same as production on unrestricted lands,

and the Secretary of the Interior is authorized and directed to cause to be paid the tax so assessed against the royalty interests on said lands: Provided, however, that such tax shall not become a lien or charge of any kind or character against the land or the property of the Indian owner.'' The foregoing section applies only to unallotted lands.

As we view the situation, when the trust patents were issued containing the reservation of the oil and gas as well as other minerals, including coal, pursuant to 41 Stat. 17, a distinct estate was thereby carved out or created consisting of the reserved minerals which the United States thereafter held in trust for the benefit of the Blackfeet Tribe; this estate was distinct, separate, and apart from the estate or interest which the United States held in trust for the benefit of the individual Indian allottees (*Superior Coal Co.* v. *Musselshell County*, 98 Mont. 501, 41 Pac. (2d) 14) ; and it follows that, as to the minerals, coal, oil and gas, there was no allotment of these lands. This construction, as we have already pointed out, is in accord with that adopted by the original parties to this lease which was approved by the Department of the Interior, the construction of which is not to be overturned unless clearly wrong, or unless a different construction is plainly required. (*Hawley* v. *Diller*, 178 U. S. 476, 488, 20 Sup. Ct. 986, 44 L. Ed. 1157 ; *United States* v. *Johnston*, 124 U. S. 236, 8 Sup. Ct. 446, 31 L. Ed. 389; *Miller Insurance Agency* v. *Porter*, 93 Mont. 567, 20 Pac. (2d) 643.)

Under the provisions of section 398, title 25 U. S. C. A., Congress has consented that the production of oil and gas on unallotted lands on Indian reservations, such as this, may be taxed by the state in which the lands are located in all respects as the same production on unrestricted lands would be taxed; and with this congressional consent there is no objection, so far as the federal Constitution and statutes are concerned, to the imposition of either the gross production tax or the operators' net proceeds tax (see *Jaybird Min. Co.* v. *Weir*, supra; *Mid-Northern Oil Co.* v. *Walker*, 268 U. S. 45, 45 Sup. Ct. 440,

69 L. Ed. 841), unless Congress has violated the treaty with the Blackfeet Tribe, or some of the agreements between the United States and this Indian tribe which were approved by Congress, to which we have referred in our opinion this day promulgated in the case of *Santa Rita Oil & Gas Co.* v. *Board of Equalization*, and then only provided Congress by such changes has violated some constitutional right. We shall, however, consider these questions, with others in connection with our treatment of the royalty owners' tax.

Passing now to that question, it will be noted that congressional consent by section 398 of title 25 U. S. C. A., extends not only to ordinary taxes, but to taxation of royalty interests on the lands. It is urged most strenuously by counsel on behalf of the tribe that the taxing of the royalties, if permitted to stand, is in violation of the treaties and agreements between the Indians and the United States, and also in violation of our state Constitution. Counsel rely on the cases of *Choate* v. *Trapp*, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941, *Carpenter* v. *Shaw*, 280 U. S. 363, 50 Sup. Ct. 121, 74 L. Ed. 478, *Morrow* v. *United States*, (C. C. A.) 243 Fed. 854, and *Carter Oil Co.* v. *Oklahoma Tax Commission*, 166 Okl. 1, 25 Pac. (2d) 1092. It was held in those cases that where lands were allotted to individual Indians under an agreement that they were to remain tax-exempt for a stipulated period, on the acceptance of the allotment patent by the individual Indian a right was vested in him which Congress was powerless to invade, in that such right was within the protection of the Fifth Amendment to the Federal Constitution; but in this case the right that is invaded, if any, is a right belonging to the tribe. If it is true that the imposition of taxes on the royalties, the property of the Indian, is in violation of a treaty or agreement between the Indians and the United States confirmed by Act of Congress, that body did not exceed its power in so violating the treaty or agreement. In the case of *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 23 Sup. Ct. 216, 220, 47 L. Ed. 299, the court said: " 'Article 12. No treaty for the cession of any portion or part of

the reservation herein described, which may be held in common, shall be of any validity or force, as against the said Indians, unless executed and signed by at least three fourths of all the adult male Indians occupying the same, and no cession by the tribe shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him as provided in Article 3' (6) of this treaty.' The appellants base their right to relief on the proposition that by the effect of the article just quoted the confederated tribes of Kiowas, Comanches and Apaches were vested with an interest in the lands held in common within the reservation, which interest could not be divested by Congress in any other mode than that specified in said twelfth article, and that as a result of the said stipulation the interest of the Indians in the common lands fell within the protection of the 5th Amendment to the Constitution of the United States, and such interest—indirectly at least—came under the control of the judicial branch of the government. We are unable to yield our assent to this view.

"The contention in effect ignores the status of the contracting Indians and the relation of dependency they bore and continue to bear towards the government of the United States. To uphold the claim would be to adjudge that the indirect operation of the treaty was to materially limit and qualify the controlling authority of Congress in respect to the care and protection of the Indians, and to deprive Congress, in a possible emergency, when the necessity might be urgent for a partition and disposal of the tribal lands, of all power to act, if the assent of the Indians could not be obtained."

Again, in the same opinion, it was said: "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government. Until the year 1871 the policy was pursued of dealing with the Indian tribes by means of treaties, and, of course, a moral obligation rested upon Con-

gress to act in good faith in performing the. stipulations entered · into on its behalf. But, as with treaties made with foreign nations (*Chinese Exclusion Case,* 130 U. S. 581, 600, 9 Sup. Ct. 623, 32 L. Ed. 1068, 1073), the legislative power might pass laws in conflict with treaties made with the Indians. (*Thomas* v. *Gay,* 169 U. S. 264, 270, 18 Sup. Ct. 340, 42 L. Ed. 740, 743; *Ward* v. *Race Horse,* 163 U. S. 504, 511, 16 Sup. Ct. 1076, 41 L. Ed. 244, 246; *Spalding* v. *Chandler,* 160 U. S. 394, 405, 16 Sup. Ct. 360, 40 L. Ed. 469, 473; *Missouri, Kansas & Texas Ry. Co.* v. *Roberts,* 152 U. S. 114, 117, 14 Sup. Ct. 496, 38 L. Ed. 377, 379; *The Cherokee Tobacco,* 11 Wall. 616, 20 L. Ed. 227.)

"The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians them-. selves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the power to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians."

This decision of the Supreme Court of the United States has not been departed from. An examination of the decisions on which counsel rely and a comparison thereof with the decision in *Lone Wolf* v. *Hitchcock,* supra, and other decisions following that one, suggest that there is a broad distinction between tribal property and private property, and between the power to abrogate a statute or treaty and the authority to destroy individual rights acquired under a law.

It is urged that the tax may not be imposed under our own ██ Constitution, section 2 of Article XII, which provides that the property of the United States shall be exempt, and under a portion of the second section of ·Ordinance No. 1, which is but a copy of the second provision of section 4 of our Enabling

Act, wherein it is provided "that no taxes shall be imposed by the state on lands or property therein belonging to or which may hereafter be purchased by the United States or reserved for its use. But nothing herein contained shall preclude the said state of Montana from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any Act of Congress containing a provision exempting the lands thus granted from taxation, but said last named lands shall be exempt from taxation by said state of Montana so long and to such extent as such Act of Congress may prescribe."

The lands under the second section of the ordinance, which refers specifically to Indian lands, are only exempt from taxation until congressional consent to taxation is had. True, the title to these lands is held in trust by the United States, and to that extent the lands are its property; and if section 2 of Article XII stood alone, it would perhaps be sufficient to exempt these lands from taxation. The provision therein contained, however, is general, whereas the provision contained in the ordinance relates specifically to Indian lands. In the construction of Constitutions, as well as statutes, broad and general provisions which tend in some measure to conflict with a specific one are controlled by the specific provision. (*Martien* v. *Porter,* 68 Mont. 450, 219 Pac. 817; *State ex rel. Corry* v. *Cooney,* 70 Mont. 355, 225 Pac. 1007.)

In view of the congressional consent expressly authorizing all of these taxes found in section 398, title 25 U. S. C. A., we find no objection to the imposition and levy of these various taxes on lands such as are described in plaintiff's complaint. Accordingly, the demurrers to plaintiff's complaint and to the complaint in intervention of the Blackfeet Tribe are sustained, and the proceeding is dismissed.

Mr. Chief Justice Sands and Associate Justices Matthews, Stewart and Morris concur.

Rehearing denied February 8, 1936.

Petition for *certiorari* to Supreme Court of the United States granted June 1, 1936.