SANTA RITA OIL & GAS CO., Plaintiff, *v.* STATE BOARD
OF EQUALIZATION et al., Defendants.

(No. 7,504.)

(Submitted December 10, 1935. Decided January 22, 1936.)

[54 Pac. (2d) 117.]

Mr. *E. K. Cheadle, Jr.,* and Mr. *G. S. Frary,* for Plaintiff, submitted a brief; Mr. *Cheadle* argued the cause orally.

Mr. *Raymond T. Nagle,* Attorney General, and Mr. *Jeremiah J. Lynch,* First Assistant Attorney General, for Defendants, submitted a brief; Mr. *Lynch* argued the cause orally.

*Messrs. Hall & McCabe*, for Intervener Blackfeet Indian Tribe, submitted a brief; *Mr. H. C. Hall* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

Plaintiff, the owner of a producing oil and gas lease on certain lands within the Blackfeet Indian Reservation, brought this original proceeding to secure an injunction against the State Board of Equalization and the individual members thereof in their official capacity, to enjoin them from collecting the "corporation license tax," the "operators' net proceeds tax," the "gross production tax," and the "royalty owners' net proceeds tax" arising out of the production and recovery of oil from the leased lands and premises.

Plaintiff in its complaint alleges its corporate capacity and the official capacity of the defendants. Myrtle Billideaux Hardy, an Indian of the Blackfeet Reservation, was the owner of an allotment under a certain "trust patent" granted by the United States of America on February 28, 1918, subject to the laws of the United States. On August 8, 1932, pursuant to such laws and the regulations of the Department of the Interior, and for a good and valuable consideration, the allottee, as lessor, executed and delivered to one P. T. Sweeney an oil and gas lease describing the lands included in her allotment. By the terms of this lease it extended for a period of ten years from and after its approval by the Secretary of the Interior, and for as long thereafter as oil and gas are produced therefrom in paying quantities. The lease was approved by the Secretary of the Interior on November 15, 1932. Thereafter Sweeney, the lessee, for a good and valuable consideration, assigned the lease by an instrument in writing unto the plaintiff, and all of his right, title and interest therein, which assignment was on November 8, 1935, approved by the Secretary of the Interior as required by law, and in pursuance to the rules and regulations of the Department of the Interior. Pursuant to the

terms of the lease plaintiff proceeded to develop the lands therein described, and on or about May 1, 1934, completed a well on these lands, producing oil in paying quantities, and since that date this well, or others located on the lands, have been producing oil in paying quantities. It is asserted in the complaint that plaintiff, in accepting the lease and proceeding with the development of the lands in question, was acting as, and now is, an instrumentality and agent of the United States of America, and therefore the state of Montana is without power to enforce, as against the plaintiff, any of the enumerated taxes. The plaintiff alleges the nature of, and the statutory authority for, each of the taxes, and that the defendants are attempting and threatening to assess, levy and collect these taxes, all of which are said to be based on oil and gas produced by it as an instrumentality and agent of the United States, and that, unless restrained, they will continue to attempt to compute, assess, levy and collect taxes on the crude oil produced from these lands. The complaint contains other allegations necessary to invoke the original jurisdiction of this court.

The Texas Company has by leave of court filed a complaint in intervention, containing allegations similar to those found in the complaint of plaintiff, but with reference to another tract of land within the same reservation, on which it holds a lease from another allottee. The Blackfeet Tribe has likewise, by leave of court, filed a complaint in intervention on behalf of the tribe and the individual allottees similarly situated to the allottee in the lease described in plaintiff's complaint.

The defendant board has filed separate demurrers to all of these complaints, on the ground that they fail to state facts sufficient to constitute a cause of action. In its brief filed subsequent to oral argument on these demurrers, it is asserted that this court is without jurisdiction to entertain the complaint of the Blackfeet Tribe and it, the tribe, without capacity to sue. This argument presents a serious question. (*United States* v. *Candelaria*, 271 U. S. 432, 46 Sup. Ct. 561, 70 L. Ed. 1023.) However, the plaintiff has raised the question of the

validity of the net proceeds royalty tax, which is the only concern of the Blackfeet Tribe, as disclosed by its complaint in intervention and brief in support thereof; and in view of the fact that under the law, as we will presently demonstrate, the plaintiff is obliged, if the tax is valid, to pay this tax on behalf of the royalty owner, it becomes necessary for us to consider the identical question presented by this complaint in intervention, whether the complaint is properly before us or not. Accordingly, we will refrain from expressing an opinion on these questions, but will proceed to consider the case as though the complaint in intervention was improperly filed and the brief of the tribe before us as one filed by *amicus curiae*.

The Corporation License Tax Law provides, sections 2296 to 2304, inclusive, Revised Codes 1921, as amended by Chapter 166, Laws 1933, for a tax "of two (2) per centum upon the total net income received by such corporation in the preceding fiscal year from all sources within the State of Montana," etc. (Sec. 2296, as amended by Laws 1933, Chap. 166, sec. 1.) Certain corporations are without the provisions of the Act, none of which are here involved. It contains numerous provisions with reference to the manner of computing the tax, providing for deductions, etc., not here important.

Section 2398, as amended by Chapter 67 of the Laws of 1923, section 1, provides in part as follows: "Every person engaging in or carrying on the business of producing, within this state, petroleum, or other mineral or crude oil, or engaging in or carrying on the business of owning, controlling, managing, leasing or operating within this state any well or wells from which any merchantable or marketable petroleum or other mineral or crude oil is extracted or produced, sufficient in quantity to justify the marketing of the same, must, for the year 1923, and each year thereafter, when engaged in or carrying on any such business in this state, pay to the state treasurer, for the exclusive use and benefit of the State of Montana, a license tax for engaging in and carrying on such business in an amount equal to two per centum of the total gross value of all petroleum

and other mineral or crude oil produced by such person within this state during such year." We will refer to this hereafter in the opinion as the "gross production tax."

Section 2089, Revised Codes 1921, as amended by Chapter 188 of the Laws of 1935, section 1, provides: "Every person, partnership, corporation, or association, engaged in mining * * * from or upon any mine whatsoever containing * * * petroleum, natural gas, or other valuable mineral or mineral deposits must on or before the thirty-first day of March in each year make out a statement of the gross yield of the above named metals or minerals from each mine owned or worked by such * * * corporation." The statement is to be made by proper officers to the defendant board and is to contain the various matters enumerated in the section.

By the terms of section 2090, as amended by section 2 of Chapter 188 of the Laws of 1935, it is made the duty of the defendant board to compute the gross value of the product in dollars and cents so reported, and to calculate and compute the net proceeds by making certain deductions from the gross product as provided in the section.

Under section 1 of Chapter 188 of the Laws of 1935, the operator is required to furnish the defendant board with the names and addresses of any and all persons owning or claiming any royalty interest in the product of the mine and the proceeds derived from its sale, and the amounts paid or yielded as royalty to each of such persons during the period covered by the statement. By section 3 of Chapter 188 the board is directed on receipt of the schedule setting forth the names and addresses of persons owning or claiming royalty, to assess the same at the full cash value of the money or product yielded during the preceding year, to be taxed on the same basis as the net proceeds of mines as provided by section 1999, Revised Codes of 1921. By section 5 of Chapter 188, amending section 2091, Revised Codes 1921, the board is directed to transmit at a specified time the valuation of the net proceeds of mines and mining claims for the purposes of taxation, to the county clerks

of the respective counties, to be placed on the assessment-roll of net proceeds of mines. By section 6 of the same Act the defendant board is directed to transmit the royalty lists to the county clerks of the respective counties, who must prepare a tax roll in the personal property. assessment-book in the name of the operator of the mine, "and such assessments when entered shall have all the force and effect as if made in the names of the owners of such royalty individually as well as against the operator. The county treasurer shall proceed to give full notice thereof to such operator and to collect the same in manner provided by law. The operator or producer shall be liable for the payment of said taxes, and same shall be payable by, and shall be collected from, such operators in the same manner and under the same penalties as provided for the collection of taxes upon net proceeds of mines; provided, however, that after payment of such tax such operator may recover or withhold from any proceeds of royalty interests, either in kind or in money, coming into his hands, the amount of any tax paid by him upon such royalty or royalty interest."

The first contention of the defendant board is that the Black-feet Indian Reservation is an Executive order reservation, and that Congress by the Act of March 3, 1927 (44 Stat. 1347, secs. 1–3, 25 U. S. C. A., secs. 398a, 398b and 398c), has given its consent to the imposition of these taxes. The plaintiff asserts that the reservation was created by treaty, or congressional Act, and that therefore these sections are without application.

On October 17, 1855, a treaty was made and concluded within what is now the state of Montana, then in the Territory of Nebraska, between commissioners on the part of the United States and the Blackfeet Tribe and other tribes of Indians. (11 Stat. 657.) By Article 4 a tract of country was described which "shall be the territory of the Blackfoot nation, over which said nation shall exercise exclusive control, excepting as may be otherwise provided in this treaty." By Article 7 it was agreed that the citizens of the United States might live and pass unmolested through the countries occupied and claimed

by the Indian tribe. By Article 8 consent was given to the United States to construct roads, lines of telegraph, and military posts, to build houses for agencies, missions, schools, etc., and to occupy permanently as much land as might be necessary for the various purposes enumerated, including the use of wood for fuel and land for grazing; and the navigation of all lakes and streams was declared to be forever free to the citizens of the United States. This treaty was ratified by the Senate of the United States on April 15, 1856 (11 Stat. 662), and on April 25, President Franklin Pierce accepted, ratified and confirmed the treaty. On July 5, 1873, President Grant by Executive order, on the recommendation of the Department of the Interior, withheld from entry and settlement as public lands all of that portion of the state of [then territory of] Montana lying west of the territory of Dakota, north of the Missouri River and the Sun River, and east of the Continental Divide, and ordered that the same be set apart as a reservation for the Blackfeet Tribe and other tribes therein enumerated. (1 Kappler's Indian Affairs, p. 854.)

Congress by the Act of April 15, 1874 (18 Stat. 28), provided that a described tract of country in the territory of Montana "be, and the same is hereby, set apart for the use and occupation of the" Blackfeet Tribe and other tribes therein enumerated. This tract was somewhat less than, but within, the area described by President Grant in his Executive order of July 3, 1873. President Grant, by Executive order on August 19, 1874, directed that the tract included in his Executive order of July 5, 1873, and not embraced within the tract set apart by the Act of Congress of April 15, 1874, be set apart for the use and occupation of the Blackfeet Tribe and the other tribes. President Hays, by Executive order on July 13, 1880, added certain additional territory to the Blackfeet Reservation. (1 Kappler's Indian Affairs, p. 856.) Congress by the Act of May 1, 1888, approved an agreement theretofore made between the commissioners on the part of the United States and the Blackfeet, whereby the Blackfeet Reservation was distinctly

described (25 Stat. 129), and in consideration of which they relinquished their claim to much of the land theretofore included within their reservation. Another and later agreement with the Blackfeet, approved by Act of Congress on June 10, 1896 (29 Stat. 353), still further reduced the reservation. By Article 5 of the agreement it was expressly provided that there should be no allotment in severalty of the land, but that the whole reservation should continue to be held by these Indians as a communal grazing tract. By the Act of March 1, 1907 (34 Stat. 1035) it was provided: "That so soon as all the lands embraced within the said Blackfeet Indian Reservation shall have been surveyed the Commissioner of Indian Affairs shall cause allotments of the same to be made under the provisions of the allotment laws of the United States to all persons having tribal rights or holding tribal relations and who may rightfully belong on said reservation. That there shall be allotted to each member forty acres of irrigable land and two hundred and eighty acres of additional land valuable only for grazing purposes; or, at the option of the allottee, the entire three hundred and twenty acres may be taken in land valuable only for grazing purposes."

The lands embraced within the reservation as finally reduced were included within the boundaries of all the reservations, whether made by treaty, agreement, congressional Act, or Executive order, to which we have referred. In the case of *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 35 Sup. Ct. 309, 311, 59 L. Ed. 673, the Supreme Court of the United States, speaking of Executive orders, said: "Scores and hundreds of these orders have been made; and treating them as they must be (*Wolsey* v. *Chapman*, 101 U. S. [755] 769, 25 L. Ed. [915] 920) as the act of the President, an examination of official publications will show that (excluding those made by virtue of special congressional action (*Donnelly* v. *United States*, 228 U. S. [243] 255, 33 Sup. Ct. 449, 57 L. Ed. [820] 825, Ann. Cas. 1913E, 710), he has during the past 80 years, without express statutory authority,—but under the claim of power so

to do,—made a multitude of Executive orders which operated to withdraw public land that would otherwise have been open to private acquisition. They affected every kind of land—mineral and nonmineral. The size of the tracts varied from a few square rods to many square miles, and the amount withdrawn has aggregated millions of acres. The number of such instances cannot, of course, be accurately given, but the extent of the practice can best be appreciated by a consideration of what is believed to be a correct enumeration of such Executive orders mentioned in public documents. They show that prior to the year 1910 there had been issued ''99 Executive orders establishing or enlarging Indian Reservations; 109 Executive orders establishing or enlarging military reservations and setting apart land for water, timber, fuel, hay, signal stations, target ranges, and rights of way for use in connection with military reservations; 44 Executive orders establishing bird reserves.

''In the sense that these lands may have been intended for public use, they were reserved for a public purpose. But they were not reserved in pursuance of law, or by virtue of any general or special statutory authority. For it is to be specially noted that there was no Act of Congress providing for bird reserves or for these Indian reservations. There was no law for the establishment of these military reservations or defining their size or location. There was no statute empowering the President to withdraw any of these lands from settlement, or to reserve them for any of the purposes indicated.'' In the case from which we have just quoted, and also the case of *Mason* v. *United States*, 260 U. S. 545, 43 Sup. Ct. 200, 67 L. Ed. 396, the validity of the Executive orders withdrawing from settlement, without congressional authority, land theretofore open for that purpose, was upheld.

It might be well at this point to review the historical reason necessitating the passage of what are now sections 398a, 398b and 398c, Title 25 U. S. C. A. Subsequent to the enactment of the general oil and gas leasing law, the Act of February 25, 1920, 41 Stat. 437 (30 U. S. C. A., sec. 181 et seq.), the Secre-

tary of the Interior held that the provisions of that Act were applicable to Executive order Indian reservation lands. (49 Land Dec. 139.) Later, on May 12, 1924, Attorney General Stone in an exhausted opinion to the President of the United States (34 Op. Attys. Gen. 171), and on May 27, 1924, in a like opinion to the Secretary of the Interior (34 Op. Attys. Gen. 181), held that Executive order Indian reservation lands were without the scope of the general oil and gas leasing Act. In the first session of the Sixty-Ninth Congress, Senate Bill 4152, relating to the leasing of unallotted lands in Executive order Indian reservations, passed both houses of that body. President Coolidge in his veto message on this measure (vol. 67, part II, Congressional Record, 12641) reviewed the effect of the decision by the Land Department and the opinions of the Attorney General cited supra, and further stated that at the time of the Attorney General's opinion twenty permits had previously been issued by the Secretary of the Interior, and that applications for more than 400 were pending, and called attention to the fact that litigation to determine the question was then pending before the Supreme Court of the United States in the case of *United States* v. *Harrison*, which was dismissed on stipulation. (*United States* v. *McMahon*, 273 U. S. 782, 47 Sup. Ct. 471, 71 L. Ed. 890.) Sections 398a, 398b and 398c, inclusive, of the Act of March 3, 1927, were apparently passed to provide a method for the leasing of lands for oil and gas in Executive order reservations. It will be noted that the *Harrison Case*, to which President Coolidge referred in his veto message, was dismissed on stipulation of counsel eleven days after this Act became effective. From these historical references and from the decisions of the Supreme Court of the United States cited supra, it appears to us to be clear that an Executive order Indian Reservation, within the meaning of sections 398a, 398b and 398c is one which owes its existence to an order made by the Chief Executive withdrawing the land within its boundaries from settlement or making other disposition of it under the public land laws of the United States without any

specific or general law enacted by Congress authorizing such withdrawal. Applying this test to the Indian reservation in question in the light of the enactments of Congress and the treaties and agreements between the commissioners for the United States and the Blackfeet Indians, which have received congressional sanction in each instance, we conclude that the reservation is not an Executive order Indian reservation.

By the second proviso of the Enabling Act, section 4, providing for the admission of the state of Montana into the Union (Act of February 22, 1889), it was declared: "That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States. * * * But nothing herein, or in the ordinances herein provided for, shall preclude the said states from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any Act of congress containing a provision exempting the lands thus granted from taxation: but said ordinances shall provide that all such lands shall be exempt from taxation by said states so long and to such extent as such Acts of congress may prescribe." These identical words were incorporated into the second proviso or section of Ordinance No. 1 to our Constitution. By the sixth section of the same ordinance it is declared that "the ordinances in this article shall be irrevocable without the consent of the United States and the people of said state of Montana." The same Enabling Act as our own applied to the admission of the state of South Dakota.

The pertinent portion of the patent issued to the allottee is as follows: "Now know ye, that the United States of America, in consideration of the premises, has allotted, and by these presents does allot, unto the said Indian the land above described, and hereby declares that it does and will hold the Land thus allotted (subject to all statutory provisions and restrictions) for the period of twenty-five years, in trust for the sole use and benefit of the said Indian and at the expiration of said period the United States will convey the same by patent to said Indian in fee, discharged of said trust and free from all charge and incumbrance whatsoever," etc.

The effect of such a "trust patent" was given consideration by the United States Supreme Court in the case of *United States* v. *Rickert*, 188 U. S. 432, 23 Sup. Ct. 478, 480, 47 L. Ed. 532, wherein it was written: "The word 'patents,' where it is first used in this section, was not happily chosen to express the thought which, it is clear, all parts of the section being considered, Congress intended to express. The 'patents' here referred to (although that word has various meanings) were, as the statute plainly imports, nothing more than instruments or memoranda in writing, designed to show that for a period of twenty-five years the United States would hold the land allotted, in trust for the sole use and benefit of the allottee, or, in case of his death, of his heirs, and subsequently, at the expiration of that period,—unless the time was extended by the President, —convey the fee, discharged of the trust and free of all charge or encumbrance. In other words, the United States retained the legal title, giving the Indian allottee a paper or writing, improperly called a patent, showing that at a particular time in the future, unless it was extended by the President, he would be entitled to a regular patent conveying the fee. This interpretation of the statute is in harmony with the explicit declaration that any conveyance of the land, or any contract touching the same, while the United States held the title in trust, should be absolutely null and void. So that the United States retained its hold on the land allotted for the period of twenty-five years

after the allotment, and as much longer as the President, in his discretion, should determine."

In the above case the state of South Dakota sought to tax the improvements and the lands held by the Indian allottee. Under the laws of South Dakota the improvements were taxed as personal property. The court there, speaking with reference to the right of the state to tax the lands, said: "If, as is undoubtedly the case, these lands were held by the United States in execution of its plans relating to the Indians,—without any right in the Indians to make contracts in reference to them, or to do more than to occupy and cultivate them,—until a regular patent conveying the fee was issued to the several allottees, it would follow that there was no power in the state of South Dakota, for state or municipal purposes, to assess and tax the lands in question until at least the fee was conveyed to the Indians. These Indians are yet wards of the nation, in a condition of pupilage or dependency, and have not been discharged from that condition. They occupy these lands with the consent and authority of the United States; and the holding of them by the United States under the Act of 1887, and the agreement of 1889, ratified by the Act of 1891, is part of the national policy by which the Indians are to be maintained as well as prepared for assuming the habits of civilized life, and ultimately the privileges of citizenship. To tax these lands is to tax an instrumentality employed by the United States for the benefit and control of this dependent race, and to accomplish beneficent objects with reference to a race of which this court has said that 'from their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.' (*United States* v. *Kagama,* 118 U. S. 375, 384 [6 Sup. Ct. 1109, 1114, 30 L. Ed. 228, 231].) So that if they may be taxed, then the obligations which the government has assumed in reference to these Indians

may be entirely defeated; for by the Act of 1887 the government has agreed at a named time to convey the land to the allottee in fee, discharged of the trust, 'and free of all charge or encumbrance whatsoever.' To say that these lands may be assessed and taxed by the county of Roberts under the authority of the state is to say they may be sold for the taxes, and thus become so burdened that the United States could not discharge its obligations to the Indians without itself paying the taxes imposed from year to year, and thereby keeping the lands free from encumbrances.''

And again it was held in the same decision that under the same constitutional provision in the state of South Dakota as we have written into Ordinance No. 1 of our Constitution, and under the identical section of the Enabling Act, the Constitution of the state of South Dakota withheld all power from the taxing officials of the state to tax the lands of an Indian allottee. The court said: ''We pass by, as unnecessary to be considered, whether the above provision in the Act of Congress of 1889 had any legal efficacy in itself, after the admission of South Dakota into the Union upon an equal footing with the other states; for the same provision, in the state Constitution, deliberately adopted by the state, is, without reference to the Act of Congress, the law for its legislature and people, until abrogated by the state. Looking at that provision, we find nothing in it sustaining the contention that the county of Roberts has any authority to tax these lands. On the contrary, it is declared in the state Constitution that lands within the limits of the state, owned or held by any Indian or Indian tribe, shall, until the title has been extinguished by the United States, remain under the absolute jurisdiction and control of the Congress of the United States. And when the state comes to declare, in its Constitution, what taxes it shall not be precluded from imposing, the provision is that it shall not be precluded from taxing, as other lands, 'any lands owned or held by any Indian who has severed his tribal relation, and has obtained from the United States, or from any person a title

thereto by *patent or other grant.'* (S. D. Const., Art. 22, subd. 2.) The patent or grant here referred to is the final patent or grant which invests the patentee or grantee with the title in fee, that is, with absolute ownership. No such patent or grant has been issued to these Indians. So that the appellee cannot sustain the taxation in question under the clause of the state Constitution to which he refers, and the right to tax these lands must rest upon the general authority of the legislature to impose taxes. But, as already said, no authority exists for the state to tax lands which are held in trust by the United States for the purpose of carrying out its policy in reference to these Indians.'' This decision was approved, adhered to, and applied under the Oklahoma Constitution, the provisions of which were not as general and all-inclusive on this subject as are our own, in the case of *McCurdy* v. *United States,* 264 U. S. 484, 44 Sup. Ct. 345, 68 L. Ed. 801.

We have said that the legislature of this state has no power to impose a tax of any character on any property or instrumentality of the federal government. (*Ford* v. *City of Great Falls,* 46 Mont. 292, 127 Pac. 1004.) This pronouncement was adhered to by this court in *State ex rel. City of Great Falls* v. *Jeffries,* 83 Mont. 111, 270 Pac. 638. It is therefore clear that the lands of this Indian allotment and the permanent improvements thereon are not the subject of state taxation so long as the lands are held in trust by the United States in the absence of its consent.

Having determined that the Blackfeet Indian Reservation is not an Executive order Indian reservation, and counsel having admitted that the lands in question are lands allotted in severalty, we point out that the authority for the lease is found in section 396, Title 25, U. S. C. A., which provides: ''All lands allotted to Indians in severalty, except allotments made to members of the Five Civilized Tribes and Osage Indians in Oklahoma, may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior; and the Secretary of the Interior is authorized to per-

form any and all Acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this paragraph into full force and effect. (Mar. 3, 1909, Chap. 263, 35 Stat. 783.)'' It will be noted that no congressional consent to the imposition of state taxes is found in this section, although such consent is expressly given in section 398, of the same title, with reference to the leasing of unallotted lands for oil and gas, and also in sections 398a, 398b and 398c, relating to lands in Executive order Indian reservations. There being no congressional consent expressed in the section authorizing the taxing of these trust patented lands, the question arises whether these various taxes here may be sustained.

Questions not unlike those under consideration have been before the Supreme Court of the United States on numerous occasions. In the case of *Choctaw, O. & Gulf R. Co.* v. *Harrison*, 235 U. S. 292, 35 Sup. Ct. 27, 28, 59 L. Ed. 234, the suit was brought to enjoin the collection of taxes claimed by the state of Oklahoma on the gross sale of coal dug from mines belonging to the Choctaw and Chickasaw Indians, which it leased and operated. The claim was based on the Oklahoma statute which provided for a gross production tax, and was resisted on the ground that in reality the demand was for an occupation or privilege tax to which the appellant could not lawfully be subjected because, as a federal instrumentality acting under congressional authority, it had leased and was operating mines to which the Indians held title. The Oklahoma Act there involved provided for a quarterly report of all persons mining coal and the amount mined at the actual cash value, and required the payment of a tax equal to 2 per centum of the gross receipts from the total production of coal therefrom. The Act further provided that the tax was in addition to the taxes levied and collected on an *ad valorem* basis. The railroad company had leased the lands pursuant to the provisions of an Act of Congress ratifying and putting into effect what was known as the ''Atoka Agreement,'' whereby the United States agreed to lease certain lands to secure royalties for the benefit of the tribe. The court,

after making reference to the terms of the statute authorizing the lease and the statute under which the tax was imposed, said: "From the foregoing it seems manifest that the agreement with the Indians imposed upon the United States a definite duty in respect to opening and operating the coal mines upon their lands, and appellant is the instrumentality through which this obligation is being carried into effect. Such an agency cannot be subjected to an occupation or privilege tax by a state." But it was there argued that the statute, rightly understood, prescribed only an *ad valorem* imposition on the personal property owned by the appellant—the coal at the pit's mouth—and the Oklahoma supreme court held according to this view. The Supreme Court of the United States, however, said of this contention: "Neither state courts nor legislatures, by giving a tax a particular name, or by the use of some form of words, can take away our duty to consider its real nature and effect (*Galveston, Harrisburg & San Antonio Ry.* v. *Texas,* 210 U. S. 217, 227, 28 Sup. Ct. 638, 52 L. Ed. 1031, 1037),'' and then held that the tax in question was in effect an occupation tax and could not be lawfully imposed.

This court, in the case of *Mid-Northern Oil Co.* v. *Walker,* 65 Mont. 414, 211 Pac. 353, 354, said of our gross production tax: "The tax is not in any sense a property tax, and neither is it exacted for regulatory purposes under the police power. The statute is a revenue measure, and the exaction is a license or occupation tax."

In the case of *Indian Territory Illuminating Oil Co.* v. *Oklahoma,* 240 U. S. 522, 36 Sup. Ct. 453, 60 L. Ed. 779, the question before the court was stated in the following language: "The question in the case is whether a certain assignment of a lease and rights thereunder, made by the Osage Tribe of Indians, which lease conferred the privilege of prospecting, drilling wells and mining and producing petroleum and natural gas upon lands in Oklahoma territory, are subject to a tax assessed under the laws of Oklahoma as the property of plaintiff in error in its capacity of a public service corporation.'' The oil company

contended that under the lease it became a federal agent, and that its business license or permit as such could not be taxed by the state government. This contention was opposed by the state of Oklahoma, as follows: "That the lease was 'not a grant of any authority, franchise, or privilege to any particular person or corporation, and is merely a permit to the Osage Tribe, authorizing such tribe to lease to any person or any number of persons upon the approval of such lease contract by the Secretary of the Interior.' It further asserts that the oil company merely occupied 'the position of an independent contractor, acting for itself and in its own behalf, in a contract with the Osage Indian Tribe,' and that therefore the relation of principal and agent between it and the government did not exist." The supreme court of Oklahoma (*In re Indian Territory Illuminating Oil Co.*, 43 Okl. 307, 142 Pac. 997) rendered two opinions, and their views as summarized by their Attorney General were stated, as follows: "The essential difference between the original opinion and the opinion on rehearing being that in the original opinion it was held that oil and gas leases, as such, constitute property as defined by the Constitution and statutes of the state of Oklahoma, and as such was subject to taxation by said state, while the opinion on rehearing held that oil and gas leases, as such, were not defined as personal property subject to taxation under the statutes of Oklahoma, nor by the Constitution of said state, and, therefore, could not be taxed as personal property; but that under the statutes the market value of the capital stock of said corporation could be taken into consideration by the State Board of Equalization in assessing the properties of said company, and could be properly considered as an element of value in assessing said properties, and that the evidence taken before the referee as to the amount of the capital stock of said company and the market value thereof, together with its tangible assets, was sufficient to sustain the assessment made by the State Board of Equalization." The Supreme Court of the United States disposed of the respective contentions as follows: "A tax upon the leases is a tax upon the

power to make them, and could be used to destroy the power to make them. If they cannot be taxed as entities they cannot be taxed vicariously by taxing the stock, whose only value is their value, or by taking the stock as an evidence or measure of their value. * * * It is manifest, therefore, when the court took the stock as evidence of the value of the property of the company the court took it as evidence of the value of the leases, and thereby justified their assessment and taxation. This, for the reasons we have stated, was error.''

In the case of *Jaybird Min. Co.* v. *Weir,* 271 U. S. 609, 46 Sup. Ct. 592, 593, 70 L. Ed. 1112, a restrictive patent was issued on the land prior to the institution of the case, that was owned by the heirs of the allottee. The mining company had a mining lease on these restricted lands on terms that provided for the payment of royalties of a percentage of the gross proceeds derived from the sale of ores mined. The suit was brought to recover taxes paid under protest, and the tax was levied on lead and zinc ores mined by the company then in the bins on the leased premises at the time the assessment was made. The assessment was made on the ores in mass before the royalties or equitable interests of the Indians had been paid or segregated. The Supreme Court of the United States in the course of its opinion in reference to this tax said: ''The land and Indian owners are bound by restrictions specified in the patent and the Acts referred to. It is the duty and established policy of the government to protect these dependents in respect of their property. The restrictions imposed are in furtherance of that policy. (*United States* v. *Noble,* 237 U. S. 74, 35 Sup. Ct. 532, 59 L. Ed. 844; *Goodrum* v. *Buffalo,* 162 Fed. 817, 89 C. C. A. 525.) The lessee is an agency or instrumentality employed by the government for the development and use of the restricted land and to mine ores therefrom for the benefit of its Indian wards. (*Choctaw, O. & Gulf R. R.* v. *Harrison,* 235 U. S. 292, 35 Sup. Ct. 27, 59 L. Ed. 234.) It is elementary that the federal government in all its activities is independent of state control. This rule is broadly applied; and, without congressional consent, no federal

agency or instrumentality can be taxed by state authority. 'With regard to taxation, no matter how reasonable, or how universal and undiscriminating, the state's inability to interfere has been regarded as established since *McCulloch* v. *Maryland,* 4 Wheat. 316 [4 L. Ed. 579].' (*Johnson* v. *Maryland,* 254 U. S. 51, 55, 41 Sup. Ct. 16, 65 L. Ed. 126. And see *Farmers' & Mechanics' Sav. Bank* v. *Minnesota,* 232 U. S. 516, 34 Sup. Ct. 354, 58 L. Ed. 706; *Choctaw, O. & Gulf R. R.* v. *Harrison,* supra; *Gillespie* v. *Oklahoma,* 257 U. S. 501, 505, 42 Sup. Ct. 171, 66 L. Ed. 338.)''

It appears from the foregoing authorities that in the absence of congressional consent to the imposition of state taxes, so far as the operators' net proceeds tax is concerned, and also the gross production tax, the state of Montana is without authority to impose these two taxes on the production of oil from lands held under a trust patent. True, it may appear that there is little reason why the distinction should be made between lands under a trust patent and lands on an Executive order Indian reservation, or between lands unallotted or a reservation created by Act of Congress. The distinction, whether justified or not, results from the fact that in the first instance Congress has not consented to the imposition of state taxes; and in the latter, congressional consent has been given. If criticism is to be leveled at this result, it must be directed at the power which created this distinction, and the sole power which has the authority to destroy it, namely, the Congress of the United States.

In the case of *Carpenter* v. *Shaw,* 280 U. S. 363, 50 Sup. Ct. 121, 123, 74 L. Ed. 478, the question involved was the validity of a royalty tax imposed by the state of Oklahoma of 3 per cent. of the gross value of the royalty. Certain lands were leased which under the Atoka Agreement between the Indians and the United States, which was ratified by Congress, were to be tax-free during a restrictive period. These lands were leased, and the Indians received a royalty on the oil produced. One of the questions before the court was whether this tax might be imposed on these lands. In the opinion written by Mr. Justice

Stone, it is said: "It sufficiently appears, were that controlling, that numerous decisions of the Oklahoma courts since the Atoka Agreement have treated the royalty interest of the lessor as a right attached and incident to his ownership or reversionary interest in the land. (*Barnes* v. *Keys*, 36 Okl. 6, 127 Pac. 261, Ann. Cas. 1915A, 515, 45 L. R. A. (n. s.) 178; *Strawn* v. *Brady*, 84 Okl. 66, 202 Pac. 505; *Harris* v. *Brady*, 136 Okl. 274, 277 Pac. 579; compare *Rich* v. *Doneghey*, 71 Okl. 204, 177 Pac. 86, 3 A. L. R. 352, and see *Parker* v. *Riley*, 250 U. S. 66, 39 Sup. Ct. 405, 63 L. Ed. 847.) But even if this did not appear to be the case, an interest commonly so regarded and practically so associated with the use and enjoyment of the allotted lands could not, under the rule of liberal construction rightly invoked by the petitioners, be deemed excluded from the benefits of the exemption granted by section 29.''

We have said of the nature of a royalty interest in the *Marias River Syndicate* v. *Big West Oil Co.*, 98 Mont. 254, 38 Pac. (2d) 599, 601, that "the word 'royalty' has a definite and well-understood meaning in oil operations. It means a share of the product or profit paid to the owner of the property. (*Homestake Exploration Corp.* v. *Schoregge*, 81 Mont. 604, 264 Pac. 388; *Hinerman* v. *Baldwin*, 67 Mont. 417, 215 Pac. 1103.) The right to take a profit from the lands of another within the common-law classification may be regarded as a profit *à prendre*. (*Homestake Exploration Corp.* v. *Schoregge*, supra.) This right, if it belong to the individual distinct from the ownership in other lands, takes the character of an interest or an estate in the land itself. It is an interest in the land, although incorporeal. (*Williard* v. *Federal Surety Co.*, 91 Mont. 465, 8 Pac. (2d) 633.) Such an interest in land may be conveyed. (*Krutzfeld* v. *Stevenson*, supra [86 Mont. 463, 264 Pac. 553].) ''

By Article 6 of the Agreement of 1888, approved by Congress (25 Stat. 115), it was declared with reference to allotments that at the end of the trust period of 25 years, the United States would "convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all

charge or incumbrance whatsoever.'' The provisions of the agreement entered into subsequently and approved by Act of Congress (29 Stat. 356) specifically provided that the agreements contained in Article 6 were thereby ''continued in full force and effect.'' (Article 9.) The imposition of the tax on Indian lands was held to be an encumbrance in the case of *United States* v. *Rickert,* supra. (See, also, *Morrow* v. *United States,* (C. C. A.) 243 Fed. 854.) Likewise, we are impelled to hold that the royalty interests accruing to the Indian allottee may not, under the foregoing authorities, become the subject of state taxation.

The case of *Gillespie* v. *State of Oklahoma,* 257 U. S. 501, 42 Sup. Ct. 171, 66 L. Ed. 338, involved a statute of that state imposing on every person in the state a tax on his entire income, with certain exemptions. Under that statute the state sought to hold the owner of certain leases on restricted Indian lands liable for taxes on his net income derived from his operations under the leases. It is not clear from the opinion whether the owner of the leases received any other income from other sources. It was, however, held by the Supreme Court of the United States, with three Justices dissenting, that the tax could not be imposed, chiefly upon the authority of the decisions to which we have heretofore referred.

The case of *Group No. 1 Oil Corporation* v. *Bass, Collector,* 283 U. S. 279, 51 Sup. Ct. 432, 75 L. Ed. 1032, presented the question whether a tax on the income from leases of state university land in Texas might be collected by the federal government, the contention being that these leases were instrumentalities of the state, and that petitioner's income derived from them was constitutionally immune from taxation as one imposed by the federal government on an instrumentality of the state. There the court observed, as to the nature of oil and gas leases, as follows: ''Section 12 of Article VII of the state Constitution, as interpreted by the highest court of the state, 'requires the legislature to dispose of the university lands by sale only.' (*Theisen* v. *Robison,* 117 Tex. 489, 502, 8 S. W. (2d) 646, 648.)

Leases of university lands like those of petitioner have been held by that court to be in compliance with this provision of the Constitution as present sales to the lessees, upon execution of the leases, of the oil and gas in place. (*Theisen* v. *Robison,* supra.) In so construing them, the court applied the settled rule of the state with respect to oil and gas leases.'' The court, after reviewing other authorities, said: ''True, since restricted, allotted, or tribal lands of Indians are instrumentalities of the federal government, it has been held that neither leases of the lands (*Indian Oil Co.* v. *Oklahoma,* 240 U. S. 522, 36 Sup. Ct. 453, 60 L. Ed. 779), nor gross income derived from them (*Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292, 35 Sup. Ct. 27, 59 L. Ed. 234; see *Howard* v. *Gipsy Oil Co.,* 247 U. S. 503, 38 Sup. Ct. 426, 62 L. Ed. 1239; *Large Oil Co.* v. *Howard,* 248 U. S. 549, 39 Sup. Ct. 183, 63 L. Ed. 416; *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609, 46 Sup. Ct. 592, 70 L. Ed. 1112); nor net income (*Gillespie* v. *Oklahoma,* 257 U. S. 501, 42 Sup. Ct. 171, 66 L. Ed. 338) may be taxed by a state. But no case has extended such immunity to property, real or personal, or income derived from its sale, where it has passed to the buyer by a completely executed act of sale, without restriction, and no interest in it has been retained for the benefit of the Indians. Whatever may be the appropriate limits of the immunity, as applied in this class of cases, those limits are clearly exceeded by that asserted here.''

In the case of *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 52 Sup. Ct. 443, 76 L. Ed. 815, it was sought to impose a federal income tax upon the owner and operator of certain oil and gas leases upon state lands within the state of Oklahoma. It appears that during the period of time it was sought to impose the tax, the lessee's entire income came from the sale of such output. The court decided that the lessee was an instrumentality of the state for the utilization of lands dedicated to the support of the public schools, and that to tax the fruits of the lease would burden the state, in the performance of a governmental function in maintaining the schools, citing the

case of *Gillespie* v. *Oklahoma,* supra. The court then said, with reference to that case, that it was disposed to apply its doctrines only in circumstances closely analogous to those which it disclosed. The case of *Group No. 1 Oil Corporation* v. *Bass,* supra, was distinguished by the majority opinion on the ground that under the Texas law the leasing of lands for oil and gas was a present sale of the lands and premises. A vigorous dissent to this opinion was filed by four members of the court, who asserted that the principle of the case of *Gillespie* v. *Oklahoma,* supra, was overruled in the *Group No. 1 Oil Corporation Case,* and that what was said in the latter case with reference to the local laws of Texas relative to the leasing of lands for oil and gas amounting to a present sale of these products, was unnecessary to the decision. It is fairly inferable from a reading of the majority opinions in the cases of *Gillespie* v. *Oklahoma,* supra, and *Burnet* v. *Coronado Oil & Gas Co.,* supra, together, that the rule of the *Gillespie Case* will only be applied where the income of an individual or corporation is solely derived from state-owned or restrictively held Indian lands. It appears on the face of the complaint, both of the plaintiff and of the Texas Company, that income was derived by these corporations during the periods of time in question, from other sources. Again the Supreme Court of the United States in the case of *Indian Territory Illuminating Oil Co.* v. *Board of Equalization,* 288 U. S. 325, 53 Sup. Ct. 388, 77 L. Ed. 812, held that where oil was produced from restricted Indian lands, removed therefrom after the payment of royalties accruing to the Indians, and then stored, such oil in storage was the subject of an *ad valorem* tax. The case of *Jaybird Mining Co.* v. *Weir,* supra, was distinguished on the facts in the two cases.

We conclude that the facts disclosed by plaintiff's complaint and the complaint of the Texas Company in intervention are insufficient to warrant the enjoining of the defendant board from proceeding to impose and collect the corporation license tax, including in the computation the income from restricted Indian lands held under trust patents.

Let judgment be entered enjoining the State Board of Equalization from assessing, imposing, levying, or collecting the "operators' net proceeds tax," the "royalty owners' net proceeds tax," and the "gross production tax" from oil and gas produced on the lands and premises described in the plaintiff's complaint and in the complaint in intervention of the Texas Company, until such time as appropriate and valid congressional consent is given to the imposition of any or all of these taxes.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.